IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| MARCELINO HERRERA and MARVELL QUINONES,<br><br>Plaintiffs,<br><br>vs.<br><br>SOUTH VALLEY FLOORS, INC., a Utah corporation; RYAN MAXWELL, an individual; and SHANNON MAXWELL, an individual,<br><br>Defendants. | **ORDER AND MEMORANDUM DECISION**<br><br>Case No. 2:16-CV-839-TC-EJF |
| SOUTH VALLEY FLOORS, INC., a Utah corporation; RYAN MAXWELL, an individual; and SHANNON MAXWELL, an individual,<br><br>Counterclaim Plaintiffs,<br><br>vs.<br><br>MARCELINO HERRERA, an individual,<br><br>Counterclaim Defendant. | |

Plaintiffs Marcelino Herrera and Marvel Quinones worked on carpet installation projects that Defendant South Valley Floors, Inc. arranged for its customers. Defendants Ryan Maxwell and Shannon Maxwell are the principals of South Valley Floors.

After a dispute arose about pay, Mr. Herrera and Mr. Quinones filed this suit for unpaid overtime, unpaid minimum wages, and retaliation in violation of the Fair Labor Standards Act

(FLSA), 29 U.S.C. §§ 207 and 216. They also filed supplemental state law claims of unjust enrichment and intentional infliction of emotional distress.

The parties filed cross-motions for summary judgment focusing primarily on the issue of whether the Plaintiffs were "employees" under FLSA (a threshold requirement for FLSA protection). For the reasons set forth below, the court finds that neither Mr. Herrera nor Mr. Quinones has met his burden to establish that he was an employee of the Defendants. Accordingly, the Defendants' request for judgment on the Plaintiffs' FLSA and related state law claims is GRANTED.

## PROCEDURAL BACKGROUND

The Defendants filed a motion for summary judgment in which they asserted, among other things, that the FLSA claims must be dismissed because the Plaintiffs were not "employees" under the FLSA and so the statute does not apply. Plaintiffs filed a cross-motion for summary judgment and an opposition brief, in which they presented evidence that they were indeed employees as defined by FLSA.

The court heard oral argument on the motions. The court initially determined that genuine disputes of material fact existed on the question of whether each of the Plaintiffs was an employee under FLSA. Because the issue is a question of law for the court, Dole v. Snell, 875 F.2d 802, 805 (10th Cir. 1989), the court could not let the Plaintiffs' FLSA claims proceed to a jury. Rather, the court had to resolve those factual disputes.

> In deciding whether an individual is an employee or an independent contractor under the FLSA, <u>a district court acting as a trier of fact must first make findings of historical facts</u> surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the [factors courts typically analyze when making a decision on this threshold issue.] Finally, employing the findings with respect to [those] factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA.

2

Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1440 (10th Cir. 1998) (emphasis added).

Resolution of those factual disputes could not be accomplished without live testimony to clarify the facts and assess witness credibility. To that end, the court held an evidentiary hearing limited to the issue of whether Mr. Herrera and Mr. Quinones were employees of South Valley Floors.[1]

Now, having reviewed the record created at the evidentiary hearing, case law, and the parties' motions, the court finds that neither Mr. Herrera nor Mr. Quinones has satisfied his burden to show that he was an employee of South Valley Floors.

## FACTS

### SVF's Business

South Valley Floors (SVF) sells flooring materials such as carpet and tile. SVF gets multiple orders each week in which the customer does not request installation. But at the customer's request, SVF installs the flooring materials. For those customers, SVF schedules the installation job with the customer and then schedules the job with an installer such as Mr. Herrera.

Shannon Maxwell is the President of SVF and manages the business's affairs. She does not go to the installation job sites. Ryan Maxwell, Ms. Maxwell's husband, goes to the installation sites to measure the amount of flooring needed for the job. Occasionally he travels to sites when a customer calls or raises an issue or concern. He does not tell the installers how to install the flooring.

---

[1] See Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1440 (10th Cir. 1998) (noting that district court, before ruling on cross-motions for summary judgment, conducted evidentiary hearing to determine whether plaintiffs were employees under FLSA).

## Mr. Herrera's Tenure at SVF and Other Flooring Companies

SVF did not train Mr. Herrera how to install carpet or any other flooring materials. Mr. Herrera learned how to install carpet when he was in California from 1998 to 2000.

Beginning in December 2010, Mr. Herrera began doing installation projects for SVF. Mr. Herrera said "I used to work for Blyle [sic] but [Ryan Maxwell] told me he was going to give me more work so I started working for him." (Tr. of Aug. 30, 2018 Evid. Hr'g at 86 ("Tr."), ECF No. 100.)

On average, Mr. Herrera performed between three to five installation jobs per week for SVF during the time he worked exclusively for SVF. But he did not start out working that often for SVF. Beginning in 2011, his work with SVF was slow. But as 2013 neared, the amount of work he did for SVF gradually increased, and, beginning in 2014, he spent essentially all of his time installing flooring for SVF customers.

Based on a review of the SVF's check ledger (Ex. A), it appears that when he began at SVF, he was paid sporadically during 2011 and 2012. Typically, SVF issued checks of varying amounts approximately two to three times a month during 2011.

In 2012, he worked three jobs for SVF totaling $968. In 2013, the amount of work increased, although checks were issued on an inconsistent basis, and the amounts varied.[2] But in 2014, 2015, and 2016, the number, dates, and check amounts increased to a point that it appears he was working almost exclusively for SVF.[3] In all, SVF paid Mr. Herrera approximately $320,000 before he quit in June 2016.

---

[2] In fact, throughout his work with SVF, Mr. Herrera's checks were different in amount and date. There was no set amount paid or regular date of issue. The payment was always dictated by the jobs, which varied from week to week.
[3] The court reaches that conclusion based on the frequency and amount of checks, both of which suggest constant work on multiple projects.

During the years he worked for SVF, he did work for other flooring companies. In 2012 and 2013, Mr. Herrera worked for Bleyl and Sons, which, apart from SVF, formed a significant portion of his income during that time. In 2013, he had constant work, splitting his time between SVF and Bleyl. But in 2014, as his worked increased up at SVF, his work at Bleyl slowed and eventually he focused on SVF. He did one small job for Bleyl in 2015. After he left SVF in June 2016, his work became more regular at Bleyl. (Ex. C.)

Apart from Bleyl and SVF, Mr. Herrera worked periodically for other flooring companies. In 2016, he did some small jobs for Garden Gate Wholesale Flooring, Inc. (Ex. D.) In the summer of 2016, he completed three jobs for Western Wholesale Flooring, Inc., earning $5,200. (Ex. E.) He worked on a few jobs for Po Boyz Karpet, Inc. in 2013, 2016, and 2017. (Ex. F.) And in July 2016, he did two installation jobs for Pro Floors of Utah. (Ex. G.) But otherwise, SVF was the main source of income for Mr. Herrera.

**Mr. Quinones' Involvement**

Marvell Quinones, who is Mr. Herrera's neighbor, never contacted SVF to ask if it had any work available and never submitted an application for employment to SVF. SVF did not offer employment to Mr. Quinones and nobody from SVF told Mr. Quinones he was "hired."

Instead, Mr. Herrera recruited Mr. Quinones to work with him at SVF job sites because he needed Mr. Quinones' help and Mr. Quinones needed work. He did not obtain permission from the Maxwells to bring Mr. Quinones to SVF job sites. Mr. Herrera briefly introduced Mr. Quinones to Mr. Maxwell and told him that Mr. Quinones would be working alongside him. Mr. Maxwell did not object. SVF never prohibited Mr. Herrera from bringing other installers with him to job sites.

5

Mr. Quinones performed work at SVF job sites with Mr. Herrera from March 2016 to June 4, 2016. Mr. Herrera taught Mr. Quinones how to install carpet. He traveled to the SVF job sites with Mr. Herrera, and he never performed flooring installation work without Mr. Herrera. According to Mr. Quinones, "I was just there to do the jobs that—to help [Mr. Herrera] with the jobs they gave to him." (Tr. at 62.)

Mr. Herrera considered Mr. Quinones to be his employee. At the completion of each installation project, Mr. Herrera paid Mr. Quinones $100 in cash per day of work.

**Assignment of Jobs**

During the time Mr. Herrera installed flooring for SVF, SVF relied on approximately twenty-five to thirty flooring installers, of which ten to fifteen were carpet installers. SVF never told Mr. Herrera or other installers that they were prohibited from working elsewhere.

SVF paid its installers a varying piece rate on a per-project basis. This is an industry standard. During its busy season, SVF had five to six carpet installers out on installation jobs on a daily basis.

After an SVF customer purchased flooring and asked that it be installed, Ms. Maxwell would begin texting or calling her list of carpet installers at three o'clock in the afternoon to see who was available to do the job. "I would schedule it with the customer and then I would schedule it with the installer the night before." (Tr. at 131.) If an installer said no, she would drop down the list. "We would be calling … whoever to fill that job." (Id. at 138.) "[T]hat's why you have 25 installers." (Id.)

Based on customers' installation completion deadlines, Ms. Maxwell tried to meet those deadlines based on her knowledge of how much each installer could handle on any given day. Occasionally, SVF installers needed an additional day.

The flooring industry standard is to treat carpet installers as independent contractors. According to Ms. Maxwell, "installers will come in and ask do you have any work? And because we have to play that game of the night before, I will take installers, you know, whatever I can get." (Id. at 143.) When asked whether it would have been "a bit easier if you had your own captive crew," she responded, "Yes, but installers don't want that. They want to be able to float and make their own hours …." (Id. at 143–44.)

Mr. Herrera was on that list of installers. Although SVF added him to that list in 2010, he left and came back "quite a few times over the years." (Id. at 158.) He floated between flooring companies. But, as described above, beginning in 2014, he spent the vast majority of his time with SVF. According to Mr. Herrera, he claims he worked 90–100 hours per week. That left no time to work for other flooring companies.

SVF did not assign Mr. Herrera a specific shift or days to work. Ms. Maxwell described the process for arranging an installation project with Mr. Herrera.

> Q. Did you ever tell [Mr. Herrera] that he could choose his own jobs or did you simply dictate to him which jobs he had to go to?
>
> A. Most of the time I would text him and tell him could you do 100 yards? Could you do 50 yards?
>
> Q. And the word "could" was used"?
>
> A. Yes.
>
> Q. Okay. So you weren't just sending him on assignments?
>
> A. No.

(Id. at 29.)

Mr. Herrera was free to decline the work, which, according to Ms. Maxwell, he did "frequently." (Id. at 30.) Toward the last two months of the parties' business relationship, Mr.

Herrera turned down installation work two to three times per week. Ms. Maxwell said he would sometimes turn the work down, "depending on if it was a little job." (Id. at 136.)

**Mr. Herrera's Pay**

SVF paid Mr. Herrera a "piece rate," which means he was paid by the yard or the foot. The rate varied based on the material Mr. Herrera installed. Typically, he was paid between $3 and $4 per yard. Sometimes SVF determined the rate and sometimes Mr. Herrera determined the rate. At times, Mr. Herrera would contact Ms. Maxwell and tell her he needed to be paid more because the material was more difficult to install. She testified that

> if he needed to be paid more I understand how hard it is to lay carpet, I have been in this industry once again for a long time, if he felt like he needed to get paid, that was something he could invoice me, most of the time I paid it … Unless it was an exorbitant amount then I would talk to him. … There was a resolution made. Whether or not it was on his part or meet in the middle.

(Id. at 30–31.)[4]

In the SVF payment ledger (Ex. A), the columns show the date of each payment to Mr. Herrera. The checks varied in amounts, and some included payment for multiple jobs. There was not a consistent payment schedule. Between July 29, 2013 and June 24, 2016, SVF paid Mr. Herrera approximately $304,000.[5]

**Mr. Herrera's Work at the Sites**

For installation work that Mr. Herrera agreed to perform, he first traveled to SVF's place

---

[4] Mr. Herrera testified that SVF set the price and there was no room to negotiate. The court finds Ms. Maxwell's testimony more credible.

[5] SVF provided Mr. Herrera with IRS 1099 forms listing that income. SVF also required installers to have both a general liability insurance policy and a workers' compensation coverage waiver. Mr. Herrera obtained workers' compensation waivers during the years 2012-2017. He provided the same documentation to other flooring companies for whom he installed carpet before, during, and after the time he installed flooring for SVF. (See, e.g., Exs. C, E, F, G.) Although Defendants point to these as evidence of independent contractor status, courts have uniformly rejected these indicia as conclusive. The courts look at the reality of the situation rather than at formal labels or subjective expectations of the parties involved.

of business to pick up the carpet, pad, and materials needed for the installation. He also picked up a work order describing the type and amount of materials, the location in the house or building where the materials were to be installed, and the customer's address and telephone number. Mr. Quinones normally waited in the car; he only went inside the SVF office a few times during the time he worked with Mr. Herrera. Ms. Maxwell spoke once with Mr. Quinones for "ten seconds." (Tr. at 142.) On that occasion, Mr. Quinones arrived in SVF's office to get material for Mr. Herrera's job because Mr. Herrera failed to show up. (Id. at 33.) Ms. Maxwell had no other interaction with him.

Once they had the materials, they traveled to the job site in Mr. Herrera's truck. At the site, they used Mr. Herrera's tools and equipment, including a kicker, a "power" device to stretch carpet, an axe, a trimmer, a chisel, and knee pads.

Nobody from SVF supervised Mr. Herrera's work. Mr. Maxwell testified that he was at a job site where Mr. Herrera worked maybe once every two weeks. On those occasions when Mr. Maxwell was at the job sites, he did not tell Mr. Herrera how to perform the installation work. (Id. at 107–08.) A few times Mr. Maxwell helped Mr. Herrera by moving furniture at the job site. He also asked Mr. Herrera to fix mistakes at job sites.

Mr. Herrera was free to come and go from SVF job sites without supervision or permission. He would sometimes leave the job site to buy materials such as tape, glue, and tack strips.

Neither Mr. Herrera nor Mr. Quinones wore a uniform, although sometimes they wore t-shirts with the SVF logo on it. SVF gave t-shirts as "gifts" to "everyone whether it be builders" or others associated with SVF. (Id. at 25.) SVF did not require the Plaintiffs to wear those shirts or any other particular clothing at work sites. (Id. at 145.) SVF did ask their installers, including

9

Mr. Herrera, to put a sign outside of the customer's house saying that flooring was installed by South Valley Floors. "[W]e did ask," but "it was never implemented, … never done." (Id. at 26.)

**The End of the Working Relationship**

Mr. Herrera and SVF parted ways in June 2016. Because Mr. Quinones' work was tied to Mr. Herrera's jobs, he too stopped working at SVF job sites. He left "[b]ecause [Mr. Herrera] stopped working for them so there was no work for me." (Id. at 78.)

## ANALYSIS

**Scope of the FLSA**

The Fair Labor Standards Act (FLSA) creates a cause of action for employees against employers violating the compensation requirements of the Act. 29 U.S.C. § 216(b). The parties have stipulated that South Valley is an "employer" for purposes of the FLSA. The issue is whether the Plaintiffs are "employees" protected by the Act, as opposed to independent contractors (as Defendants contend) who cannot maintain a claim under the FLSA. Johnson v. Unified Gov't of Wyandotte Cty./Kansas City, Kan., 371 F.3d 723, 727 (10th Cir. 2004); see also Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295 (1985) (FLSA only protects employees). The Plaintiffs, who seek unpaid wages, bear the initial burden of proving an employer-employee relationship. E.g., Purdham v. Fairfax Cty. Sch. Bd., 637 F.3d 421, 427 (4th Cir. 2011); Johnson v. Heckmann Water Res. (CVR), Inc., 758 F.3d 627, 630 (5th Cir. 2014); Specht v. City of Sioux Falls, 639 F.3d 814, 819 (8th Cir. 2011).

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Supreme Court recognized the "striking breadth" of this definition. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992). But "[c]ourts have adopted an

10

expansive interpretation of the definitions relating to employment status under the FLSA, in order to effectuate its broad remedial purposes." Dole v. Snell, 875 F.2d 802, 804 (10th Cir. 1989). Accordingly, "in determining whether an individual is covered by the FLSA, 'our inquiry is not limited by any contractual terminology or by traditional common law concepts of 'employee' or 'independent contract.''" Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1440 (10th Cir. 1998) (quoting Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567, 570 (10th Cir. 1994)).

**The "Economic Realities" Test**

For purposes of determining employee status under the FLSA, the Tenth Circuit applies the "economic realities test." Barlow v. C.R. England, Inc., 703 F.3d 497, 506 (10th Cir. 2012); Baker, 137 F.3d at 1440. "The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself." Doty v. Elias, 733 F.2d 720, 722–23 (10th Cir. 1984), quoted in Barlow, 703 F.3d at 506 (internal citations omitted). The court should evaluate "whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." Baker, 137 F.3d at 1440.

The Tenth Circuit has articulated six specific, but non-exclusive, factors to aid in that analysis:

    (1)    the degree of control exerted by the alleged employer over the worker;

    (2)    the worker's opportunity for profit or loss;

    (3)    the worker's investment in the business;

    (4)    the permanence of the working relationship;

    (5)    the degree of skill required to perform the work; and

(6) the extent to which the work is an integral part of the alleged employer's business.

Id. "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach." Johnson, 371 F.3d at 729.

**Mr. Quinones**

SVF had no meaningful interaction, much less a relationship with Mr. Quinones. Mr. Quinones worked for Mr. Herrera, not SVF. Mr. Herrera testified that he considered Mr. Quinones to be his employee. He brought Mr. Quinones into the projects. He never asked for permission to use Mr. Quinones as an aid. He paid Mr. Quinones. When Mr. Herrera left SVF, Mr. Quinones left, saying there was no more work for him.

Because Mr. Quinones' role in SVF's business was so minor, application of the economic-reality test is not necessary. The record clearly establishes that he was not SVF's employee.

**Mr. Herrera**

As set forth below, the totality of the circumstances, which are discussed in the court's analysis of the six factors, leads to the conclusion that Mr. Herrera was an independent contractor, not an employee of SVF.

1. Degree of Control Exerted by SVF

SVF hired Mr. Herrera on a project-by-project basis rather than for an indefinite period of time. His rate of pay (the piece rate) was, to a limited extent, subject to negotiation each time he agreed to take a project. Although SVF set the installation deadline based on what it negotiated with the customer, Mr. Herrera was given the choice of whether to take the job after its parameters were described.

SVF did not require Mr. Herrera to take a particular type or number of jobs at SVF. They did not prohibit him from taking jobs with other companies while he was working with them. There is no evidence of negative consequences for taking other work. On occasion he did work for others, yet SVF still called him, often, for jobs.

SVF did not require that he wear a uniform or advertise SVF's services. Although there was an attempt to do so (e.g., their request that he display an SVF sign), their requests were rarely carried out and there is no evidence of negative consequences for failing to do so.

SVF did not supervise Mr. Herrera's work. Mr. Maxwell was not regularly at the sites during installation (Ms. Maxwell never went to sites). And he did not tell Mr. Herrera how to install the carpet when he was there.

After agreeing to take a job (and he was free to decline the offer, which he did frequently), he traveled to the warehouse to pick up materials and job information and then traveled to the site in his truck. Given the nature of the business, SVF provided the materials to be installed, but Mr. Herrera used his own tools and would purchase tape and other small items with his own money when needed.

Mr. Herrera hired Mr. Quinones, whom he considered to be his employee. He did not ask SVF for permission to hire Mr. Quinones, and even when Mr. and Ms. Maxwell were aware of Mr. Quinones, they did not object, much less say he could not hire an assistant.

This factor weighs in favor of finding independent contractor status.

2. Opportunity for Profit or Loss

Mr. Herrera had some flexibility to maximize his profit on each job. SVF paid him by the foot or yard of flooring installed—i.e., a piece rate—which he the ability (albeit limited) to negotiate. He was free to choose how many projects to take, and when to take them. He was not

precluded from working for a different flooring company, particularly if he was not getting enough work from SVF. He could, and did, hire someone to help him on projects, which allowed him to increase the volume of his business.

This factor weighs in favor of independent contractor status.

3. Investment in the Business

It is apparent from the record that SVF's business was much larger and more complex than Mr. Herrera's carpet installation work. Although he purchased his own tools and used his own truck to travel to and from sites, his investment in the work is minor compared to SVF's investment in the business. This factor weighs in favor of employee status.

4. Permanence of the Working Relationship

"'Independent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." Dole, 875 F.2d at 811.

Mr. Herrera had a five-and-a-half-year working relationship with SVF. During the first few years, he worked on a significant number of projects with Bleyl while at the same time doing work for SVF. But for the last two-and-a-half of those years, he worked exclusively on SVF installation jobs,[6] as demonstrated by multiple payments every month during those years. (See Ex. A.)

Yet his relationship with SVF was not of "indefinite duration." He was always hired on a per-job basis. SVF had enough business to provide him with regular jobs. He chose to take those jobs, and did quite well. From 2014 until he quit in 2016, SVF paid him $294,000. The record demonstrates that he was able to go to other flooring companies if he wanted more work

---

[6] He did some jobs for Bleyl, but those were very minor in comparison.

14

or different work. But he chose to stay with SVF. During the evidentiary hearing he testified that, "when I am working for a company, I like to focus on them and not look for something else." (Tr. at 87.)

Despite the length and exclusivity of his work with SVF, the court finds that this factor does not decidedly weigh in favor of employee status. The record clearly establishes that he took advantage of SVF's busy schedule and always did work on a project-by-project basis at a pace he chose. Still, because his sole source of income was SVF, this factor favors Mr. Herrera to some extent.

5. Degree of Skill Required to Perform the Work

"The lack of the requirement of specialized skills is indicative of employee status." Dole, 875 F.2d at 811.

Although carpet installation does not require extensive education, independent study, or licensing, it does require training, practice, and skill. Mr. Herrera said he learned the trade over a period of two-and-a-half years in California. SVF did not provide any training or supervision because Mr. Herrera possessed the necessary skills. SVF hired him because he was an experienced carpet installer.

The court finds that this factor does not weigh in favor of either independent contractor or employee status.

6. Extent to which Work was Integral to SVF's Business

This factor requires analysis of "whether the nature of the plaintiff's task, considered in the context of the defendant's business, [is] essential to the company's objective." Lee v. ABC Carpet & Home, 186 F. Supp. 2d 447, 457 (S.D.N.Y. 2002) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 726, 729–30 (1947)). There is no question that carpet installation is

15

integral to SVF's business.  Even though not every flooring sale required installation, SVF provides the option to its customers.  This factor weighs in favor of employee status.

**<u>Conclusion</u>**

The focus of the court is "whether the individual is economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself." <u>Doty v. Elias</u>, 733 F.2d 720, 722–23 (10th Cir. 1984), <u>quoted in</u> <u>Barlow</u>, 703 F.3d at 506 (internal citations omitted).  The factors discussed above do not necessarily have equal weight and the court looks at them from a qualitative, rather than a quantitative, perspective.

Of particular importance to the court is Mr. Herrera's freedom to pick and choose the jobs offered to him.  He was hired on a project-by-project basis rather than for an indeterminate amount of time.  He exercised his option to turn down jobs that SVF offered to him.  He had some say in his rate of pay.  He was able to control his income by hiring Mr. Quinones as an assistant, whose work allowed him to finish a job faster and take on more jobs.

Although Mr. Herrera worked exclusively for SVF for a couple of years, the record shows that SVF kept him so busy that he had no need or time to look for other work.  Yet he had the right and ability to work for other flooring companies if he so chose, which he did on occasion during even his busiest times with SVF.

Based on the record, the court concludes that, under the totality of the circumstances, Mr. Herrera was an independent contractor.

Because the court finds that neither Mr. Herrera nor Mr. Quinones was an employee of SVF as defined by FLSA, all of their FLSA claims are dismissed.  As for their state law claims (unjust enrichment and intentional infliction of emotional distress), those claims have no merit,

as was discussed at the close of the May 22, 2018 hearing on the cross-motions for summary judgment.

## **ORDER**

For the reasons set forth above, the court GRANTS Defendants' Motion for Summary Judgment (ECF No. 60) and DENIES Plaintiffs' Motion for Summary Judgment (ECF No.57).

DATED this 27th day of March, 2019.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge